# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### COOKEVILLE DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:19-cr-00003-1** |
| | ) | **Judge Aleta A. Trauger** |
| | ) | |
| **HEATHER MARKS** | ) | |

## MEMORANDUM and ORDER

Before the court is the government's Motion to Preclude Jacob Bach From Being Admitted As an Expert ("Motion to Preclude"). (Doc. No. 443.) The defendant opposes the motion. (Doc. No. 450.) For the reasons set forth herein, the motion will be denied.

## I. STANDARD OF REVIEW

Federal Rule of Evidence 702 governs the admissibility of expert testimony. Under this rule:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> >
> > (b) the testimony is based on sufficient facts or data;
> >
> > (c) the testimony is the product of reliable principles and methods; and
> >
> > (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. In other words, the party offering an expert's opinion bears the burden of establishing the admissibility of such opinion by a preponderance of the evidence. *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 344, 251 (6th Cir. 2001). An expert's testimony will be admissible

under the rule if (1) the witness is "qualified by 'knowledge, skill, experience, training, or education'"; (2) the testimony is relevant, "meaning that it 'will assist the trier of fact to understand the evidence or to determine a fact in issue'"; and (3) the testimony is reliable. *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529 (6th Cir. 2008) (quoting Fed. R. Evid. 702 (2000)).

Aside from Rule 702, the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), provided a non-exhaustive list of factors for courts to consult in evaluating the reliability of expert testimony, including "testing, peer review, publication, error rates, the existence and maintenance of standards controlling the technique's operation, and general acceptance in the relevant scientific community." *United States v. Langan*, 263 F.3d 613, 621 (6th Cir. 2001) (citing *Daubert*, 509 U.S. at 593–94). However, the reliability test is "'flexible,' and the *Daubert* factors do not constitute a 'definitive checklist or test,' but may be tailored to the facts of a particular case." *In re Scrap Metal Litig.*, 527 F.3d at 529 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999)). The Sixth Circuit has "recognized that the *Daubert* factors 'are not dispositive in every case' and should be applied only 'where they are reasonable measures of the reliability of expert testimony.'" *Id.* (quoting *Gross v. Comm'r*, 272 F.3d 333, 339 (6th Cir. 2001)).

The standard to exclude an expert's testimony under *Daubert* is high, and "rejection of expert testimony is the exception, rather than the rule." *Nusbaum v. Enlighten Fam. Chiropractic, LLC*, No. 19-cv-10223, 2023 WL 319782, at *5 (E.D. Mich. Jan. 19, 2023) (collecting cases). Typically, "[i]f there is a reasonable factual basis for expert testimony, it should be admitted." *Id.* (citations omitted). Moreover, the Sixth Circuit has emphasized the distinction between the "credibility and accuracy" of a proffered opinion and its reliability. *In re Scrap Metal*, 527 F.3d at 529. "The task for the district court in deciding whether an expert's opinion is reliable is not to

determine whether it is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation." *Id.* at 529–30. Generally, any issue regarding the credibility or accuracy of admitted expert testimony goes to the weight rather than the admissibility of the evidence, and it can be addressed via cross-examination and the "presentation of contrary evidence" by opposing counsel. *Id.* at 530 (quoting *Daubert*, 509 U.S. at 596).

Rule 702, by requiring that an expert's testimony be relevant, implicitly incorporates the evidentiary rules governing relevance. Accord *Daubert*, 509 U.S. at 491 ("Expert testimony which does not relate to any issue in the case is not relevant and, *ergo*, non-helpful." (citation omitted)). Rule 401 defines relevant evidence as evidence that has "any tendency to make a fact more or less probable than it would be without the evidence" *and* "the fact is of consequence in determining the action." Fed. R. Evid. 401. Relevant evidence is generally admissible, while irrelevant evidence is not. Fed. R. Evid. 402.

## II.    BACKGROUND

Defendant Marks, a nurse practitioner, is charged in a Superseding Indictment with distributing and conspiring (with her former co-defendant, Hemal Mehta, M.D.) to distribute Schedule II controlled substances outside the usual course of professional practice and without a legitimate medical purpose, in violation of 21 U.S.C. §§ 846 and 841. After numerous settings and resettings over the course of the past seven years, this matter is now scheduled for trial on May 5, 2026.

On March 12, 2026, Marks sought leave to file the Expert Notice of Jacob Bach outside the previously set deadline, along with the proposed Notice and Bach's Expert Report. (Doc. Nos. 431, 431-1, 431-2.) The court granted the motion as unopposed. (Doc. No. 432.)

### A. Bach's Report

As set forth in his Report, Bach is a Certified Public Accountant licensed in Tennessee and Illinois and a Certified Fraud Examiner. He has "more than a decade of specialized experience in forensic accounting and financial investigations," with a particular emphasis on white collar criminal investigations involving "embezzlement, fraud, asset misappropriation," and "broader corporate misconduct." (Doc. No. 431-2, Report at 3.) Before joining his current firm, he was a Forensic Accountant with the Federal Bureau of Investigation in the Chicago Field Office. (*Id.* at 4.)

Bach states that he was engaged by defendant's counsel in this matter to provide his "professional forensic accounting opinions and analyses related to matters identified by Counsel in connection with the allegations brought against Ms. Marks." (*Id.*) To form this opinion, he examined financial documents, bank records, and other material produced by the government associated with Marks, her former co-defendant, Dr. Mehta, and his affiliated businesses, including the business that employed Marks from September 2016 through May 2018, Healthcare Resource Management, LLC ("HRM"). (*Id.*) In addition, Bach reviewed "provider salary and compensation benchmark data published by the Medical Group Management Association ('MGMA')." (*Id.* at 6.) According to Bach, "MGMA compensation data is widely used within the healthcare industry and provides market-based benchmarks for clinical provider salaries, including Nurse Practitioners, based on specialty, geographic region, and practice characteristics." (*Id.*)

Bach explains the scope of his investigation as follows:

> As part of my forensic accounting procedures, I analyzed the financial activity within HRM's bank accounts to identify significant transactions, patterns, or anomalies, and to assess, within a reasonable degree of certainty, whether the activity reflected any indication that an individual or entity received financial benefit or gain in connection with the Alleged Scheme during the period of Ms. Marks' employment.

> I also compared and cross-referenced HRM's account activity with the personal and business bank records of Ms. Marks and Dr. Mehta to determine whether any transfers, deposits, or other financial activity correlated across these accounts in a manner relevant to the allegations.

(*Id.* at 5.)

> Bach reaches two primary conclusions based on his analysis of the referenced documents:
>
> (1) that "the financial records and compensation benchmark analyses indicate that Ms. Marks did not receive any excess funds or other financial benefit beyond her regular and reasonable salary that would be attributable to the conduct alleged by the Government"; and
>
> (2) that "the financial records indicate that the incremental funds associated with HRM's increased income during the period of conduct alleged by the Government were paid or otherwise disbursed to Dr. Mehta, and not to Ms. Marks."

(*Id.* at 6.) Bach reached his sub-opinion that Marks' salary from HRM during her employment was "regular and reasonable" based on his comparison of Marks' salary with "MGMA industry benchmark levels for nurse practitioners," which indicated to him that Marks' payroll compensation from HRM "does not reflect inflated, atypical, or otherwise unusual pay." (*Id.*) He also explained that the MGMA benchmark "provided an external reference point to assess whether [Marks'] compensation levels were consistent with market norms." (*Id.* at 8.) And he notes that "MGMA benchmark data is regularly relied upon by hospitals, medical practices, regulators, and valuation professionals in assessing the reasonableness of physician and advanced practice provider compensation." (*Id.* at 8 n.4.) Because MGMA compensation benchmarks were not available for years prior to 2021, Bach "restated" Marks' compensation from 2016 through 2018 "into 2021 dollars to allow for an appropriate, like-kind comparison to the available benchmark data." (*Id.* at 8.) To make that adjustment, he used the Consumer Price Index ("CPI-U") annual average values published by the U.S. Bureau of Labor Statistics. (*Id.*) Based on this data, he found that Marks' compensation during her employment at HRM

consistently fell within the 10th to 25th percentile range of MGMA benchmarks and never approached median-level compensation or mean for nurse practitioners. This reflects that, from the outset and her tenure at HRM, she was paid at the lower end of market norms for her role . . . with no indication of an inflated or atypical pay structure, and her compensation remained in these lower percentiles for the entire period of her employment.

(*Id.* at 9.)

As part of the analysis underlying Bach's second opinion, he concluded from his review of the financial documentation that HRM's income increased during Marks' employment but that Marks' income remained stable during this period, while Mehta's "payroll compensation and check payments from HRM increased significantly . . . in alignment with HRM's revenue growth, indicating that Dr. Mehta, not Ms. Marks, was the financial beneficiary of the increased income during the period of conduct alleged by the Government." (*Id.* at 7.)

**B.      The Government's Motion**

The government characterizes this case as "about Marks' rampant, unauthorized prescribing of controlled substances under the guise of practicing legitimate medicine at a pain clinic." (Doc. No. 443 at 1.) It claims that it will "prove that Marks benefited from her illegal conduct by receiving a salary and [that] her illegal conduct allowed her to retain her position at the pain clinic for years." (*Id.*)

Regarding Bach's proposed testimony, the government characterizes his Report as setting forth opinions that (1) "Mark[s] received a reasonable salary based on Bach's extrapolation of salary data" and (2) "Mehta made more money than Marks." (*Id.* at 2.) Citing Federal Rules of Evidence 702 and 4013, the government's Motion to Preclude argues that (1) Bach lacks the "expertise to opine on the first conclusion"; (2) in any event, his opinion regarding the reasonableness of Marks' salary is irrelevant; and (3) his opinion about Mehta's income "is not an

expert opinion" but simply "summarize[s] deposits made in the various bank accounts associated with the Defendant."[1] (*Id.*)

More specifically, the government does not dispute, as a general proposition, Bach's qualifications to testify as an expert in the area of forensic accounting. Instead, it maintains that Bach's opinion regarding the reasonableness of Marks' salary while she was employed by HRM has nothing to do with his expertise as a forensic accountant, that he has not demonstrated proficiency or training in "determining the normative pay of a nurse practitioner," and that, in any event, his theory of reasonableness is unreliable, because Bach fails to establish that the MGMA data on which he relies has been tested or peer-reviewed or to show that his extrapolations from data post-dating the years during which Marks was employed by HRM are generally accepted.

Second, the government contends that this opinion regarding the reasonableness of Marks' salary is irrelevant because the government does not seek to prove that Marks made more than other nurse practitioners working at pain clinics in Tennessee. Rather, "[t]he Government will simply present evidence that Marks made a salary for working at [HRM], and that she knew that if she discharged too many patients or did not fill enough pain prescript[ion]s, she could lose that job." (*Id.* at 7.) In short, according to the government, Bach's proposed testimony "does not make the fact that she was paid 'more probable or less probable.'" (*Id.*

Finally, the government does not object to Bach's presenting "summary testimony"—that is, to present summary exhibits under Federal Rule of Evidence 1006 showing that Mehta financially benefited over the relevant period. (*Id.*) It argues, however, that Bach's testimony should not be presented to the jury as "expert" testimony because "it is not expert testimony," and

---

[1] It is unclear whether the government's use of the term "Defendant" here is intended to refer to Marks or to Mehta.

labeling it as such "could confuse the jury and/or give such summary testimony undue weight." (*Id.*)

### C.     The Defendant's Response

In her Response in Opposition to the Motion to Preclude, the defendant "clarifies" that Bach, "consistent with his professional training and experience," will "identify and interpret financial patterns and anomalies that may indicate whether [Marks] had any financial motive for the conduct charged." (Doc. No. 450 at 2.) She asserts that analysis of "whether financial data reflects indicators of benefit or motive lies squarely within the field of forensic accounting and fraud examination" and that the "absence of motive is nearly always relevant to questions of intent"—particularly when "the Government seeks to imply financial advantage as the driving force behind the alleged conduct." (*Id.*)

The defendant also characterizes the government's intention to present summary evidence of financial documents through a lay witness as effectively seeking to "present interpretive financial conclusions" implying that the defendant acted with an improper motive" "without the foundation of expert analysis." (*Id.*) In contrast, according to Marks, she seeks to have Bach offer expert testimony not just to summarize voluminous records but to "clarify what the financial records actually show" and to "explain whether the data meaningfully supports or undermines the Government's claims about financial motive." (*Id.* at 2; *see also id.* at 11 ("[A]s his report shows, he engages in interpretive analysis while reviewing the Government's summary exhibits . . . .").)

Regarding Bach's ability to testify about the reasonableness of Marks' salary, Marks argues that, in applying his expertise as a forensic accountant, he "regularly and necessarily reviews compensation information and compares it to recognized benchmarks (such as MGMA data) to determine whether any results stand out as irregular or financially significant." (*Id.* at 3.) The defendant also explains that the reasonableness of Marks' salary is just "one facet" of Bach's

overall analysis, "building to the overall conclusion that nothing in the financial records indicated any criminal activity" by Marks. (*Id.* at 6.) In other words, the defendant says, Bach does not intend to offer an expert opinion on "determining the normative pay" of a nurse practitioner, as the government insists, but instead he is "using those [MGMA] reports as one of a number of data points to help him evaluate the financial records as a whole." (*Id.* at 7.)

Marks also points out that Rule 703 specifies that an expert's opinion can be based on "facts or data in the case that the expert has been made aware of or personally observed" and, moreover, that, "[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted." Fed. R. Evid. 703. She asserts that the MGMA data is squarely among the types of "facts or data" that an expert can rely upon in forming opinions. (Doc. No. 450 at 7 (citations omitted).) And Bach also attests that his Report was "prepared in accordance with applicable AICPA professional standards, including the Statement on Standards for Forensic Services No. 1, which establishes the professional responsibilities and methodological framework for forensic accounting and litigation consulting engagements." (Report at 3; *see also id.* at 7.)

## III. DISCUSSION

### A. Reliability and Relevance of Bach's Sub-Opinion on the Reasonableness of Marks' Salary

Upon reviewing the relevant testimony in light of the parties' arguments and the applicable standards, the court finds that Bach's opinion that Marks' salary from HRM was "reasonable" is both relevant and reliable.

#### 1. Relevance

The government acknowledges that it seeks to prove that Marks "benefited from her illegal conduct by receiving a salary" and to argue that her continued employment was sufficient to

motivate her illegal prescribing practices. (Doc. No. 443 at 1.) In light of that position, the court is not convinced by its argument that Bach's proposed testimony that Marks' salary was reasonable and, in fact, below the median is irrelevant. As set forth above, relevant evidence is evidence that tends to make any fact "of consequence in determining the action" more probable or less probable. Fed. R. Evid. 401. Marks' motive to engage in illegal activity is a fact of consequence in this action. *Accord United States v. Logan*, 250 F.3d 350, 369 (6th Cir. 2001) (recognizing that "proof of motive [is] always welcome" (citing *Pointer v. United States*, 151 U.S. 396, 414 (1894)))), *abrogated on other grounds by rule amendment, as recognized in McAuliffe v. United States*, 514 F. App'x 542, 549 (6th Cir. 2013); *Lallathin v. Lazaroff*, No. 2:05-cv-1155, 2006 WL 3257395, at *13 (S.D. Ohio Nov. 9, 2006) ("[P]roof of motive is always relevant in a criminal case as it relates to the mental state of a defendant, [even though] it is not an essential element of the crime." (citations omitted)). Consequently, evidence that tends to call into question the government's theory of motive is relevant.

The court finds that evidence that Marks' salary was reasonable is relevant for purposes of the Rule 702 analysis and for purposes of Rule 402.

### 2. Reliability

Even though relevant, the proffered testimony is not admissible unless reliable. As set forth above, Rule 703 expressly states that an expert's opinion may be based "on [his] own expertise and analysis, which may include reference to reliable studies on which 'experts in the particular field would reasonably rely.'" *In re Flint Water Cases*, No. 5:16-cv-10444-JEL-EAS, 2024 WL 3495377, at *12 (E.D. Mich. July 22, 2024) (quoting Fed. R. Evid. 703).

According to Bach, the MGMA "conducts one of the most widely recognized national compensation surveys for healthcare providers," and the benchmark data on which he relied in part to form his opinion as to the reasonableness of Marks' salary is "regularly relied upon by . . .

regulators and valuation professionals." (Report at 8 n.4.) Bach also fully explained how he analyzed and adjusted the available data in accordance with the CPI-U annual inflation averages. (*Id.* at 8.)

As set forth above, the *Daubert* reliability test is "flexible," and its factors apply only "where they are reasonable measures of the reliability of expert testimony." *In re Scrap Metal Litig.*, 527 F.3d at 529. The court's task here is not to determine whether Bach's proffered testimony is credible and correct, "but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation." *Id.* at 529–30. It is apparent to the court here that Bach's proposed testimony does not rest on unsupported speculation but on the reasoned assessment of available data. The MGMG surveys that informed his assessment of the reasonableness of Marks' salary fall within the scope of Rule 703. The government remains free to cross-examine Bach as to the correctness of his conclusions, but the defendant has established that Bach's opinion regarding the reasonableness of Marks' salary rests on a reliable foundation.

### B.  Admissibility of Expert Testimony Regarding Mehta's Income

Again, the government does not quibble with Bach's qualifications to testify as an expert in the field of forensic accounting. Regarding testimony about Mehta's income, the government's only objection is that the proposed testimony is not truly expert testimony but, instead, simply summary testimony that could be offered by a lay witness under Federal Rule of Evidence 1006.

Under Rule 1006, "[t]he court may admit as evidence a summary, chart, or calculation offered to prove the content of voluminous admissible writings, recordings, or photographs that cannot be conveniently examined in court, whether or not they have been introduced into evidence." Fed. R. Evid. 1006(a). Generally, such evidence must be "accurate and nonprejudicial," meaning that the summary should not be "embellished by or annotated with the conclusions of or

inferences drawn by the proponent." *United States v. Bray*, 139 F.3d 1104, 1110 (6th Cir. 1998) (citations omitted).

Expert testimony is broadly defined as evidence in the form of an opinion offered by an expert qualified "by knowledge, skill, experience, training, or education" to offer that opinion. Fed. R. Evid. 702. In addition, among other things, the expert's specialized knowledge "will help the trier of fact to understand the evidence or to determine a fact in issue. Fed. R. Evid. 702(a).

Here, it is clear that Bach does not seek simply to present summary evidence in a neutral and nonprejudicial manner. Rather, he seeks to rely (in part) on summary evidence introduced by the government but, using his expertise, to explain and draw conclusions from the available evidence, including evidence from other accounts not analyzed by the government. (*See* Report at 15.) He applied his experience and training in the field of forensic accounting to analyze Mehta's various bank accounts, and his specialized knowledge will assist the jury in understanding that evidence.

Moreover, Bach does not conclude simply that Mehta made more money than Marks. Rather, he concludes that

> HRM's income increased substantially during the relevant period, yet Ms. Marks' compensation remained stable and represented a declining share of HRM's total income. [And], during the same period, Dr. Mehta's payroll compensation and other disbursements increased both in absolute terms and as a percentage of HRM's income. Taken together, these financial patterns support the conclusion that the incremental funds associated with HRM's increased income during the period of alleged conduct were paid or otherwise disbursed to Dr. Mehta, not Ms. Marks.

(Report at 17.) While Bach may not depart far from the summary data, he apparently analyzed multiple accounts through the lens of his technical expertise, and he draws opinions from that data rather than simply reporting the data itself.

The government's only objection to Bach's proposed second opinion is that it is not truly "expert testimony." The court finds that it is.

## IV.    CONCLUSION AND ORDER

For the reasons set forth herein, the government's Motion to Preclude (Doc. No. 443) is

**DENIED**.

It is so **ORDERED**.

_____
ALETA A. TRAUGER
United States District Judge